*Court of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*



# OPINION

No. 04-07-00830-CV

**KLN STEEL PRODUCTS COMPANY, LTD.**,
Appellant/Cross-Appellee

v.

**CNA INSURANCE COMPANIES**, National Fire Insurance Company of Hartford, Continental
Casualty Company, and American Guarantee and Liability Insurance Company,
Appellees/Cross-Appellants

From the 150th Judicial District Court, Bexar County, Texas
Trial Court No. 2006-CI-09448
Honorable Michael P. Peden, Judge Presiding

Opinion by: Rebecca Simmons, Justice

Sitting: Alma L. López, Chief Justice
Catherine Stone, Justice
Rebecca Simmons, Justice

Delivered and Filed: December 31, 2008

AFFIRMED IN PART, REVERSED IN PART, AND RENDERED IN PART

This is a duty to defend case. KLN Steel Products Company, Ltd. (KLN) sued CNA

Insurance Companies, National Fire Insurance Company of Hartford, Continental Casualty

Company (collectively CNA) and American Guarantee and Liability Insurance Company

(AGLIC) seeking a declaration that CNA and AGLIC have a duty to defend KLN and indemnify

KLN against a competitor's suit.[1]  KLN also asserted claims for breach of contract and extra-contractual claims.  All parties moved for summary judgment and the trial court denied all parties' motions.[2]  This mutually agreed interlocutory appeal followed.

On appeal, KLN contends that CNA and AGLIC have a duty to defend KLN against the lawsuit brought against it by Michelle D. Connell and Hi-Tech Beds Systems Corp. (collectively Hi-Tech).  Both CNA and AGLIC respond that they have no duty to defend KLN, as a matter of law, and even assuming potential coverage, Hi-Tech's allegations fall within the policies' exclusions.  Because (1) the allegations in Hi-Tech's complaint do not reveal a potential claim within the covered risks under the insurance policies, and (2) alternatively, the allegations in the complaint fall within clearly defined exclusions, we affirm the trial court's denial of summary judgment with regard to KLN and reverse and render judgment with regard to the trial court's denial of summary judgment in favor of CNA and AGLIC.

BACKGROUND

**A. Procedural History**

Hi-Tech filed suit against KLN and Clark/Blinderman/Knight, L.L.C. (Clark) specifically asserting claims in its complaint for (1) patent infringement, (2) misappropriation of trade secrets, (3) unfair business practices and unfair competition, and (4) interference with a prospective business relationship.  CNA and AGLIC subsequently denied coverage under the policies and consequently refused to defend KLN.  In the alternative, CNA and AGLIC claimed multiple policy exclusions defeat any duty to defend KLN.  The trial court denied both summary

---

[1]  The underlying suit, *Michelle D. Connell & Hi-Tech Beds Systems Corp. v. KLN Steel Products Co. & Clark/Blinderman/Knight, L.L.C.*, Case # 04-C-0194, is pending in the District Court of the Northern District of Illinois.  CNA and AGLIC denied coverage and this declaratory judgment action ensued.
[2]  KLN moved for partial summary judgment on its claim for duty to defend only.  It did not move for summary judgment on its breach of contract or insurance violation claims.

judgments and this appeal followed pursuant to Texas Civil Practice and Remedies Code section 51.014(d). TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(d) (Vernon 2008).

## B. The Hi-Tech Complaint

Since a determination of the duty to defend an insured is based on the factual allegations contained within the complaint, a brief summary of pertinent allegations is set forth. According to Hi-Tech's complaint, Hi-Tech learned in 1999 that the United States Navy planned to construct open barracks at its Naval Station Great Lakes training center and would need to purchase beds. In response, Hi-Tech supplied its original version of the SB-200, which is a mobile space saving storage sleeper or bed, both to the Navy and Clark, a procurement company, with the Navy's and Clark's assurances that (1) the design would be kept confidential and (2) the bed would be kept in a restricted part of the training center. The Navy and Clark also knew that the SB-200 was the embodiment of pending patents.[3]

KLN had been the major provider of beds for the Navy's training center prior to 2000. Upon learning of the training center expansion, KLN determined that it would submit only its current model bed to the Navy for use at the training facility. In the latter part of 2001 and early 2002, Clark, the procurement company, issued a request for proposals for beds with specifications almost identical to the Hi-Tech SB-200. KLN used its special relationship and influence with the Navy to gain access to and examine Hi-Tech's first version of the SB-200. As a result, KLN obtained, through improper means, confidential information not available to the public regarding the SB-200. KLN was thus able to design a bed equivalent to the SB-200 and submit a response to Clark's request for proposals for the manufacture of a bed with the same features as the SB-200. Thereafter, KLN repeatedly gained improper access to, and acquired

---

[3] We acknowledge that KLN set forth the facts as alleged by Hi-Tech solely for argument before this Court and without any admission of the facts described therein.

proprietary and confidential information about, improved versions of the SB-200 located at the training center and used that information to create infringing, competing products. KLN then used its infringing models, based on the SB-200, to usurp sales of the Hi-Tech SB-200. The specific allegations that KLN contends create a duty to defend will be discussed below.

## STANDARD OF REVIEW

Whether a duty to defend exists is a question of law that we review de novo. *St. Paul Ins. Co. v. Tex. Dep't of Transp.*, 999 S.W.2d 881, 884 (Tex. App.—Austin 1999, pet. denied). In an insurance coverage dispute, the insured has the initial burden of establishing that its claim comes within the scope of coverage provided by the policy. *Venture Encoding Serv., Inc. v. Atl. Mut. Ins. Co.*, 107 S.W.3d 729, 733 (Tex. App.—Fort Worth 2003, pet. denied). The burden then shifts to the insurer to show that the claim falls within a policy exclusion or limitation of coverage. *Id.* If the insurer succeeds in showing the applicability of an exclusion, the burden shifts back to the insured to show that an exception to the exclusion brings the claim within coverage. *Id.*

## DUTY TO DEFEND

KLN asserts that a liberal reading of the facts alleged in the Hi-Tech complaint reveals a potential claim within the coverage of the policy and, thus, a duty to defend KLN against the claim. KLN specifically focuses on potential claims that fall under "personal and advertising injury," including claims of (1) publication of disparaging material and (2) trade dress infringement. We first address the rules governing our review of the pleadings and the insurance policies and then analyze each of the foregoing claims separately.

## A.  The Eight-Corners Rule

"'[T]he duty to defend is distinct from, and broader than, the duty to indemnify.'"  *Zurich Am. Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487, 490 (Tex. 2008) (alteration in original) (quoting 14 LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INSURANCE § 200:1 (3d ed. 2007)).  An insurer's duty to defend is triggered if the factual allegations in the plaintiff's complaint potentially support a covered claim, while the duty to indemnify is based on whether the alleged facts are actually established.  *Id.*; *see also GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 310 (Tex. 2006); *Heyden Newport Chem. Corp. v. S. Gen. Ins. Co.*, 387 S.W.2d 22, 26 (Tex. 1965) ("'Where the complaint does not state facts sufficient to clearly bring the case within or without the coverage, the general rule is that the insurer is obligated to defend if there is, potentially, a case under the complaint within the coverage of the policy.'" (quotation omitted)).  An "insurer is obligated to defend a suit if the facts alleged in the pleadings would give rise to any claim within the coverage of the policy."  *Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 201 (Tex. 2004); *St. Paul Ins. v. Tex. Dep't of Transp.*, 999 S.W.2d 881, 884 (Tex. App.—Austin 1999, pet. denied) (reiterating that if an insurer owes a duty to defend any portion of the suit, the insurer must defend the entire suit).

The eight-corners rule takes its name from the fact that only two documents are ordinarily relevant to the determination of the duty to defend: the policy and the pleadings of the third-party claimant.  *GuideOne*, 197 S.W.3d at 308.  The eight-corners rule requires the court to compare the allegations in the petition filed against the insured with the coverage afforded by the insurance policy.  *King v. Dallas Fire Ins. Co.*, 85 S.W.3d 185, 187 (Tex. 2002).  Facts outside the pleadings, even those easily ascertained, are not material to the court's determination.  *Nat'l Union Fire Ins. Co. v. Merchs. Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex. 1997).

When applying the eight-corners rule, an appellate court gives a liberal interpretation to the allegations in the petition and any doubt regarding the duty to defend is resolved in favor of the duty. *Dallas Fire Ins.*, 85 S.W.3d at 187; *Nat'l Union Fire Ins.*, 939 S.W.2d at 141. The truth or falsity of the allegations in the pleadings is not a factor; similarly, what the parties know or believe to be the true facts is not a factor. *Zurich*, 268 S.W.3d at 491; *GuideOne*, 197 S.W.3d at 311.

The insured need only show that a reasonable reading of the plaintiff's allegations would allow evidence of a claim that is covered by the policy, not that the claim itself be clearly enunciated within the pleadings. *Terra Int'l, Inc. v. Commonwealth Lloyd's Ins. Co.*, 829 S.W.2d 270, 271 (Tex. App.—Dallas 1992, writ denied). Moreover, the pleadings are read in light of the insurance policy's provisions and an appellate review focuses on the petition's factual "'allegations that show the origin of the damages rather than on the legal theories alleged.'" *Nat'l Union Fire Ins.*, 939 S.W.2d at 141 (quotation omitted); *see also Adamo v. State Farm Lloyds Co.*, 853 S.W.2d 673, 676 (Tex. App.—Houston [14th Dist.] 1993, writ denied) ("It is not the cause of action alleged which determines coverage but the *facts* giving rise to the alleged actionable conduct.").

In accordance with the eight-corners rule, we first examine the pertinent insurance policies and then review the Hi-Tech complaint.

**B. The Policies**

1. CNA Policies

The CNA policies[4] at issue in this case are as follows:

(1) general commercial liability insurance policy issued for the periods September 30, 2000 to September 30, 2001 (the 2001 CNA Policy);

---

[4] Although we refer to these policies collectively as the "CNA policies," they were actually issued by Continental Casualty Company and National Fire Insurance Company.

(2) general commercial liability insurance policy issued for the periods September 30, 2001 to September 30, 2002 (the 2002 CNA Policy);

(3) general commercial liability insurance policy issued for the periods September 30, 2002 to September 30, 2003 (the 2003 CNA Policy);

(4) general commercial liability insurance policy issued for the periods September 30, 2003 to September 30, 2004 (the 2004 CNA Policy); and

(5) an umbrella policy issued for the period September 30, 2000 to September 30, 2001 (the 2001 CNA Umbrella Policy).

### a. The 2001 CNA Policy

The 2001 CNA Policy is slightly different from the later policies and provides that CNA has the duty to defend KLN against any suit seeking damages because of "personal injury" or "advertising injury" as defined in the policy. The policy covers:

(1) "Personal injury" caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you;

(2) "Advertising injury" caused by an offense committed in the course of advertising your goods, products, or services . . . .

The policy definitions include:

1. "Advertising injury" means injury arising out of one or more of the following offenses:

(a) Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services.

. . . .

13. "Personal injury" means injury, other than "bodily injury," arising out of one or more of the following offenses:

. . . .

(d) Oral or written publication of material that slanders or libels a person or organization or *disparages* a person's or organization's goods, products or services.

(emphasis added).

### b. The Remaining CNA Policies

The remaining 2002-2004 CNA Policies provide that CNA has the duty to defend KLN against any suit seeking damages for "personal and advertising injury" caused by an offense arising out of KLN's business if the offense was committed in the coverage territory during the policy period. The policies provide the following relevant definitions:

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters.[5]

14. "Personal and advertising injury" means injury, including consequential "bodily injury," arising out of one or more of the following offenses:

. . .

d. Oral or written publication [in any manner][6] of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

. . .

g. Infringing upon another's copyright, trade dress or slogan in your "advertisement."

## 2. The AGLIC Policies

KLN obtained two commercial umbrella policies from AGLIC: (1) from December 31, 2000 to December 31, 2002; and (2) December 31, 2002 to December 31, 2004.

**Coverage A** provides excess follows-form liability insurance, which commits AGLIC to pay covered damages in excess of the limits of the underlying CNA policy, and specifically incorporates the terms and conditions of the CNA policy. Thus, AGLIC's duty to defend under Coverage A is triggered upon exhaustion of the underlying insurance by payment of claims. According to AGLIC, Coverage B provides almost identical coverage.

---

[5] The 2003 and 2004 CNA Policies also provide that (1) "notices that are published include material placed in the [I]nternet or a similar electronic means of communication; and (b) regarding websites, only that part of the website that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement."

[6] This language was not included in the 2002 CNA policy.

**Coverage B** provides separate umbrella liability insurance due to bodily injury, property damage or "personal and advertising injury," provided the injury, damage or offense took place during the policy period and "is caused by an occurrence happening anywhere." "Advertisement" and "personal and advertising injury" are defined in equivalent language as that used in the CNA policies. Occurrence is further defined as "a covered offense." Coverage B does not apply to a suit "for which insurance is afforded under underlying insurance or would have been afforded except for the exhaustion of the limits of insurance of underlying insurance."

## C. Timeliness of Conduct

We first address CNA's contention that the allegations of the complaint affirmatively establish that the allegedly covered claims did not arise within the coverage period of the 2000[7] or 2001 CNA Policies. CNA asserts the trial court erred in denying its request for a declaration of no coverage under the 2000 general commercial liability and umbrella policies because there is no conduct alleged to have occurred during the policy period of September 1999 to September 2000. KLN did not respond to this issue in its brief; and we find no allegation in the complaint concerning KLN's conduct arising prior to "the latter part of 2001." Consequently, the trial court erred in failing to grant CNA summary judgment on this issue. We hold CNA is entitled to a declaration, as a matter of law, that no duty to defend or indemnify arises from the 2000 CNA Policy.

CNA next asserts that the Hi-Tech complaint does not allege any covered offense occurred between September 30, 2000 and September 30, 2001 and, therefore, KLN is not entitled to a defense under the 2001 CNA Policy because the offense or incident must be committed *during the applicable policy period*. KLN argues the alleged personal injury and

---

[7] The general commercial liability insurance policies issued by CNA for the period September 30, 1999 to September 30, 2000 are referred to as "the 2000 CNA Policy."

advertising injury offense of disparagement initially occurred between the "latter part of 2001" (when the first request for proposal was issued) and late 2002 (when the second request for proposal was issued). As such, the "latter part of 2001," interpreted liberally, could include a period before September 30, 2001, and thus fall within the relevant policy. CNA counters that a plain reading of the complaint shows that the *earliest* misconduct could not have occurred prior to September 30, 2001.

An analysis of the complaint does not completely clarify this issue. The sequence of events is unclear. The complaint alleges that between 1999 and the latter part of 2001, Hi-Tech placed the original version of the SB-200 at the Navy training center. The request for proposal for beds at the training center was issued "during the latter part of the year 2001 and early 2002." In general, the complaint provides that "KLN *then* used its influence and special relationship to improperly gain access" to Hi-Tech's bed to obtain confidential information, produce an equivalent bed and publish the alleged disparaging comments. (emphasis added). Yet, the complaint lacks any time period within which these events occurred. Being mindful that the pleadings must be read favorable to coverage, we interpret the "latter part" as any time in the second half of 2001. Accordingly, because KLN's response to the request for proposal, including the alleged disparagement, could have occurred prior to September 30, 2001, we overrule CNA's contention that KLN's actions did not fall within the 2001 CNA Policy period.

**D. Publication of Disparaging Material**

KLN asserts that CNA's and AGLIC's duty to defend arises under the 2001 CNA Policy and Umbrella Policy because these policies cover claims for personal injury and advertising injury arising from the publication of material disparaging an organization's goods, products, or services. Likewise KLN claims a duty to defend arises under the remaining CNA and AGLIC

policies because these policies cover claims for "personal and advertising injury" arising from the publication of material disparaging an organization's goods, products, or services.

CNA and AGLIC dispute both KLN's interpretation of "advertising injury" as defined in the policies, as well as KLN's assertion that the Hi-Tech complaint sets forth claims that fall within the coverage of the policies. CNA asserts that the coverage extended to injury arising from the publication of material disparaging an organization's goods, products, or services, pertains to the tort of business disparagement, the elements of which the Hi-Tech complaint does not contain. Because disparagement is not defined within the policies, KLN argues that CNA cannot apply the definition of a business disparagement tort to its policies.[8] *See Bay Elec. Supply, Inc. v. Travelers Lloyds Ins. Co.*, 61 F. Supp. 2d 611, 617 (S.D. Tex. 1999) ("[T]he Court is to look to the understanding of the average insured, and . . . the average insured is [not] required to know the obscure distinctions between common law business torts; instead the burden to identify such distinctions and incorporate them into the policy should fall upon the insurer.").

### 1. "Disparage"

We agree with KLN that the policies do not incorporate the elements of the business tort of disparagement. When a term is not defined in an insurance policy, it must be given its plain, ordinary, and generally accepted meaning, unless the policy indicates the term was used in a technical or different sense. *Tri County Serv. Co., Inc. v. Nationwide Mut. Ins. Co.*, 873 S.W.2d 719, 721 (Tex. App.—San Antonio 1993, writ denied). The Merriam-Webster Dictionary

---

[8] KLN acknowledges Hi-Tech's complaint does not state a business disparagement claim, which requires proof of four elements: (1) the defendant published a false, defamatory statement of fact about the plaintiff, (2) with malice, (3) without privilege, (4) that resulted in special damages to the plaintiff. *See Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003).

defines "disparage" as "to lower in rank or reputation; DEGRADE" or "speak slightingly about." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 360 (11th ed. 2003).

2.  Allegations of KLN's Publication of Disparaging Material

Having determined the plain meaning of disparage under the policies, we now turn to the pleadings.  As a basis for disparagement, KLN first points to Hi-Tech's allegation that KLN convinced the Navy to have its unauthorized copy of the SB-200 installed in the Naval Base Museum at the training center, and represented that it was the developer of the bed:  "KLN wrongfully represented that it was the developer of the SB-200, and that its bed was accepted by the Navy as the new standard for beds to be used at the Great Lakes Recruit Training Center." KLN asserts that a liberal reading of this allegation is that KLN belittled or disparaged Hi-Tech's SB-200 beds by representing that Hi-Tech's beds were not original designs, but simply copies of KLN's design.  As a second basis for disparagement, KLN points to the complaint's allegation that KLN offered to provide the SB-200 equivalent at "a substantially lower price than could be sold by [Hi-Tech]."  KLN asserts this allegation connotes a claim of disparagement of Hi-Tech's goods or products by implying that (1) the Hi-Tech beds are overpriced and (2) Hi-Tech cannot offer its beds at competitive prices.  Finally, KLN asserts Hi-Tech's complaint alleges violations of the Illinois Deceptive Business Practices Act which prohibits a party from "disparag[ing] the goods, services, or business of another by false or misleading representation of fact."  815 ILL. COMP. STAT. ANN. § 510/2(a)(8) (West 2001).  KLN argues the allegations in the complaint outlined above allege facts sufficient to support disparagement under the Illinois Deceptive Business Practices Act.  *See id.*

CNA responds that KLN is trying to create a disparagement claim where none exists. CNA acknowledges that, in general, product disparagement may provide a basis for a claim

under the Illinois Deceptive Business Practices Act, but argues that the Hi-Tech complaint does not support such a claim. AGLIC emphasizes that Hi-Tech's complaint does not allege a single negative statement that KLN made regarding Hi-Tech or its goods or products.

### 3. Analysis

We are bound by the eight-corners rule and although we "liberally construe the allegations in the petition in determining the duty to defend, resolving any doubt in favor of the insured, we will not read facts into the pleadings for that purpose." *Trinity Universal Ins. v. Cowan*, 945 S.W.2d 819, 825 (Tex. 1997) (citations omitted). The factual allegations must be pled in the complaint. *Id.* According to the relevant policies, the disparagement must be directed to "goods, products or services." According to the Illinois Deceptive Business Practices Act, the disparagement must be of "the goods, services, or business of another." 815 ILL. COMP. STAT. ANN. § 510/2(a)(8) (West 2001). To invoke the duty to defend under the "personal injury" provision of the 2001 CNA Policy and the "personal or advertising injury" provision of the 2001-2004 CNA Policies, publication of the disparaging material must arise from KLN's business. To invoke the duty to defend under the "advertising injury" provision of the 2001 CNA Policy, the disparagement must be committed in the course of KLN's advertising.

Hi-Tech's complaint alleges patent infringement, trade secret theft, unfair competition and deceptive trade practices by KLN. It further alleges that KLN overstated its status as the designer and developer of the SB-200 bed. However, the complaint does not allege that KLN disparaged or published any negative remarks *about the SB-200 bed or Hi-Tech. See Houston Petroleum v. Highlands, Ins. Co.*, 830 S.W.2d 153, 156-57 (Tex. App.—Houston [1st Dist.] 1990, writ denied) (denying coverage, the court held the complaint alleging untrue statements regarding the business was silent with regard to any allegation of "publication or utterance of a

libel or slander or other defamatory or disparaging material"). KLN's statement that it developed the SB-200 bed does not disparage the *bed or business* of Hi-Tech. Although Hi-Tech's complaint states that KLN made misrepresentations about its bed and its source, those misrepresentations were about its own products, not those of Hi-Tech. Thus, while the Hi-Tech complaint alleges that KLN stole and copied Hi-Tech's design, it does not allege that KLN disparaged Hi-Tech's goods or products. *See Homedics, Inc. v. Valley Forge Ins. Co.*, 315 F.3d 1135, 1142 (9th Cir. 2003) ("It does not follow that because an entity imitated the design of a product, it is, therefore, disparaging it."). Likewise, under the Illinois Deceptive Business Practices Act, "a person engages in a deceptive trade practice when . . . the person . . . disparages the goods, services, or business of another." 815 ILL. COMP. STAT. ANN. § 510/2(a)(8) (West 2001). There is simply no allegation in the complaint that KLN disparaged Hi-Tech or its goods, services, or business.

Because we determine that Hi-Tech's complaint does not contain any allegations supporting the publication of disparaging material, we need not reach the issue of whether the publication of disparaging material was committed in the course of KLN's advertisement.

## E. Trade Dress Infringement

KLN next argues that the 2001-2004 CNA Policies provide coverage for personal and advertising injury arising out of "[i]nfringing upon another's copyright, **trade dress** or slogan in your 'advertisement.'" (emphasis added). Because "trade dress" is not defined within the policy, KLN argues the plain meaning of "trade dress," not the defined elements of trade dress under the Lanham Act, should control. *See* 15 U.S.C. § 1125(a)(3) (2000); *Tri County Serv.*, 873 S.W.2d at 721. According to KLN, trade dress includes a product's design, size, and shape. Hi-Tech's complaint alleges that KLN stole Hi-Tech's trade secrets and made an "equivalent" bed.

This allegation, according to KLN, constitutes the infringement of Hi-Tech's trade dress. KLN additionally argues that the marketing of its copy of the Hi-Tech bed to the Navy, and other military establishments, constitutes advertising. The policies define "advertisement" as "a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters."

CNA responds that KLN mischaracterizes Hi-Tech's trade secret infringement claims as "trade dress" in an attempt to secure coverage. Hi-Tech's complaint does not use the term "trade dress" or identify the overall image of Hi-Tech's bed. Rather, it describes KLN's theft and then use of Hi-Tech's trade secrets in fashioning KLN's bed. Furthermore, even if the complaint could be characterized as including trade dress infringement, CNA contends that the infringement did not occur within an "advertisement." Finally, CNA asserts that there is no causal connection between the alleged advertising activity and the resulting harm to Hi-Tech.

1. The Meaning of Trade Dress Infringement

Trade dress infringement is a technical term arising from the law of unfair competition. *Blue Bell Bio-Medical v. Cin-Bad, Inc.*, 864 F.2d 1253, 1256 (5th Cir. 1989). KLN urges us to give the terms "trade dress" and "infringement" their common and plain meaning, and to avoid incorporating elements of the Lanham Act. *See* 15 U.S.C. § 1125(a) (2000). However, even the definitions of trade dress advanced by KLN are based on cases interpreting the Lanham Act.[9] The purpose of the Lanham Act was to codify and unify the common law of unfair competition and trademark protection. *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 861 n.2 (1982) (White, J., joined by Marshall, J., concurring). Texas courts have acknowledged that the common law elements of unfair competition including trademark "are no different than those

---

[9]  *Blue Bell*, 864 F.2d at 1256-57; *Hassan v. Greater Houston Transp. Co.*, 237 S.W.3d 727, 729 (Tex. App.—Houston [1st Dist.] 2007, pet. denied).

under federal trademark law." *All Am. Builders, Inc. v. All Am. Siding of Dallas, Inc.*, 991 S.W.2d 484, 488 (Tex. App.—Ft. Worth 1999, no pet.); *see also Zapata Corp. v. Zapata Trading Int'l, Inc.*, 841 S.W.2d 45, 47 (Tex. App.—Houston [14th Dist.] 1992, no writ); *Horseshoe Bay Resort Sales Co. v. Lake Lyndon B. Johnson Improvement Corp.*, 53 S.W.3d 799, 806 (Tex. App.—Austin 2001, pet. denied). Consequently, we look to the Lanham Act, and cases thereunder, for the meaning of trade dress infringement.

"Trade dress . . . consists of the total image of a product or service, including product features such as design, size, shape, color, packaging labels, [and] color combinations . . . ." *Hassan v. Greater Houston Transp. Co.*, 237 S.W.3d 727, 729 n.1 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). "'Trade Dress' is a term used to describe the 'overall appearance and image in the marketplace of a product or a commercial enterprise. For a product, trade dress typically comprises packaging and labeling. . . . If a trade dress is *distinctive and nonfunctional*, it may be protected under trademark law.'" *I & JC Corp. v. Helen of Troy L.P.*, 164 S.W.3d 877, 882 n.1 (Tex. App.—El Paso 2005, pet. denied) (emphasis added) (quoting BLACK'S LAW DICTIONARY 1500 (7th ed. 1999)). As described by the Supreme Court:

> The design or packaging of a product may acquire a distinctiveness which serves to identify the product with its manufacturer or source; and a design or package which acquires this secondary meaning, assuming other requisites are met, is a trade dress which may not be used in a manner likely to cause confusion as to the origin, sponsorship, or approval of the goods. In these respects protection for trade dress exists to promote competition.

*TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28 (2001).

In its discussion of trade dress, the Supreme Court cautioned that: "Trade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products. . . . As the Court has explained, copying is not always discouraged or disfavored by the laws which preserve our competitive economy." *Id.* at 29 (citation omitted).

The Court also noted: "Allowing competitors to copy will have salutary effects in many instances. 'Reverse engineering of chemical and mechanical articles in the public domain often leads to significant advances in technology.'" *Id*. (citing *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 160 (1989)). Clearly, then, copying a product is not equivalent to infringing a product's trade dress.

Trade dress infringement, in the context of design, is generally established by proving two basic elements. First, the trade dress must be valid. To be valid, the public must recognize the design as distinguishable from that of others and that the distinguishing design must be non-functional. To be protected, trade dress must "extend[] only to incidental, arbitrary or ornamental product features which identify the source of the product. If a product feature is functional, it cannot be protected trade dress. Unless protected by patent or copyright, functional product features may be copied freely by competitors in the market place." *Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH*, 289 F. 3d 351, 355 (5th Cir. 2002). The second basic element requires the trade dress be infringed. Infringement means that the trade dress of the defendant's product is so similar to that of the plaintiff that it is likely to cause confusion as to the product's source. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 775 (1992).

2. Allegations of Trade Dress Infringement in the Complaint

The term "trade dress" is not mentioned in the complaint, but that does not limit our review. The facts contained in the complaint rather than the legal theories alleged control our analysis. *Farmers Tex. County Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 82 (Tex. 1997). Focusing on the section of the complaint entitled "Misappropriation of Trade Secrets," KLN contends Hi-Tech's complaint alleges that KLN misappropriated the dimensions and other design features of the SB-200 and its progeny including its counterbalance option which KLN

used to build and offer its own equivalent products. By providing its copied bed to the Navy to be displayed at the Naval Base Museum, and continuing to market its equivalent bed to the military, KLN used Hi-Tech's trade dress in its "advertisements" to Clark, the Navy, and the military generally.[10] Thus, KLN asserts that Hi-Tech has clearly alleged facts that would support a claim for trade dress infringement. We disagree. A liberal reading of the complaint fails to reveal a potential claim for trade dress infringement.

As noted above, to be protectable trade dress the design must have a distinctiveness that serves to identify the product with its manufacturer as well as be nonfunctional. The Supreme Court has cautioned against the overuse of trade dress as "product design almost invariably serves purposes other than source identification." *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 213 (2000). There is no feature or design of the Hi-Tech bed that is alleged to be distinctive and nonfunctional. The only specific component of a Hi-Tech bed mentioned in Hi-Tech's complaint is the superior lift mechanism incorporated in the counterbalance bed. This component is described by its function. Furthermore, even if the superior lift mechanism could be regarded as trade dress, the complaint does not allege that KLN copied and supplied the counterbalance bed to the Navy, but that KLN informed Clark and Navy personnel "of their intention to develop and supply in the future a bed that uses Plaintiffs' counterbalance option." A product that does not yet exist cannot infringe trade dress because it does not satisfy the second element of trade dress infringement—that the similarity of the trade dress is likely to cause confusion as to the product's source.

KLN argues that the complaint's allegation that KLN copied information including "technical information, dimensions, and other design information" from Hi-Tech, and then used

---

[10] KLN uses the definition of "advertisement" contained in the policies, which do not require such advertisements to be written.

the information to make an equivalent bed, is sufficient to support a trade dress infringement claim because it encompasses the total image of Hi-Tech's bed. We disagree. The complaint contains no allegations of any distinctive nonfunctional feature copied by KLN. Copying the total image of a product, without more, does not amount to trade dress infringement. Indeed, the Supreme Court is clear in its acknowledgement that, in many instances, there is no prohibition against copying goods and products unprotected by an intellectual property right. *TrafFix*, 532 U.S. at 29. We decline to accept KLN's notion that copying a non-distinct product or feature is equivalent to trade dress infringement.[11] We, therefore, hold that even under a liberal reading of Hi-Tech's complaint, the facts do not support a potential claim for trade dress infringement.

## POLICY EXCLUSIONS

Because we have determined that the claims of disparagement and trade dress infringement are insufficient to invoke coverage, we do not address whether the policy exclusions would relieve CNA and AGLIC of a duty to defend.

## AGLIC AS EXCESS CARRIER

In a separate point, AGLIC asserts that as the excess carrier, it does not owe a duty to defend to KLN because AGLIC's policy covers the same risks as provided by CNA's policy under Coverage A and, therefore, if CNA does not owe coverage to KLN, then neither does AGLIC. Moreover, AGLIC coverage is triggered upon KLN's exhausting the limits of the CNA policy. Thus, even if the allegations were covered claims, because KLN has not exhausted its coverage under the CNA policy, AGLIC's coverage has not been triggered. In *Emscor Manufacturing, Inc. v. Alliance Insurance Group*, 879 S.W.2d 894, 903 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (citing *Union Indem. Ins. Co. of N.Y. v. Certain Underwriters at*

---

[11] Generally, utility patent protection and trade dress protection are mutually exclusive in that a utility patent covers functional features and trade dress covers non-functional features or marks. *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29-30 (2001); *Blue Bell Bio-Medical v. Cin-Bad, Inc.*, 864 F.2d 1253, 1256-57 (5th Cir. 1989).

*Lloyd's*, 614 F. Supp. 1015, 1017 (S.D. Tex. 1985)), the appellate court explained the difference

between a primary insurer and an excess carrier:

> *In a situation in which there are primary and excess insurance coverages, the limits of the primary insurance must be exhausted before the primary carrier has a right to require the excess carrier to contribute to a settlement.* [citations omitted] In such a situation, the various insurance companies are not covering the same risk; rather, they are covering separate and clearly defined layers of risk. The remote position of an excess insurer [thus] greatly reduces its chance of exposure to a loss. This reduced risk is generally reflected in the cost of the excess policy.

*Id.* (first alteration in original); *see also U.S. Fire Ins. Co. v. Scottsdale Ins. Co.*, 264 S.W.3d

160, 173 (Tex. App.—Dallas 2008, no pet.) (holding that duties to defend and indemnify were

not triggered until the self insured retention limits were exhausted).

The AGLIC policies provide coverage for excess follows form liability insurance under

Coverage A[12] and umbrella liability insurance under Coverage B. More specifically, the AGLIC

policy provides, in pertinent part:

> Coverage A: Notwithstanding anything to the contrary contained above, if underlying insurance does not cover damages, for reasons other than exhaustion of applicable limits of insurance by payment of claims, then we will not cover such damages.

> Coverage B: Under Coverage B, we will pay on behalf of the insured, damages the insured becomes legally obligated to pay by reason of . . . personal and advertising injury covered by this insurance . . . in excess of the Retained Limit . . . or the amount payable by other insurance, whichever is greater.

AGLIC argues that Coverage A covers the same risks as provided by the CNA policies and

because none of the allegations contained within the Hi-Tech complaint satisfy the CNA policy

agreement, it cannot satisfy the Coverage A insuring agreement. Additionally, because the

applicable limit of underlying insurance has not been exhausted, AGLIC owes no defense to

KLN under Coverage A. Moreover, because AGLIC's Coverage B provides almost identical

---

[12] A "follows form" policy covers all the same risks or "follows form" to the underlying primary policy.

coverage to the claims covered under CNA, KLN cannot assert claims under the AGLIC policy that are not covered under the CNA policies. We agree. Because the CNA policies and the AGLIC policies include the same terms, conditions and exclusions, KLN has failed to establish coverage under either Coverage A or Coverage B of the AGLIC policy. Accordingly, the trial court erred in failing to grant the summary judgment in favor of AGLIC. *Emscor*, 879 S.W.2d at 903; *see also BASF AG v. Great Am. Assur. Co.*, 522 F.3d 813, 823 (7th Cir. 2008) (deciding that because the primary insurance policies and the umbrella policies utilized the same language and definitions, the claims not insured by the primary policy were not insured by the umbrella policy).

### CONCLUSION

We affirm the portion of the trial court's order denying summary judgment in favor of KLN and reverse the portion of the trial court's order denying summary judgment in favor of CNA and AGLIC. We further render judgment that, as a matter of law, neither CNA nor AGLIC owe a duty to defend KLN in connection with the Hi-Tech complaint.

Rebecca Simmons, Justice